IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED
10:03 am, Mar 03 2021
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___________Deputy

Northern Division

**IN THE MATTER OF THE SEARCH OF:**

**CELLULAR TELEPHONE CURRENTLY IN THE CUSTODY OF THE TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION (TIGTA) LOCATED AT 5000 ELLIN ROAD, SUITE A1-400, LANHAM MARYLAND, 20706**

**CASE NO:** 1:21-mj-408 TMD

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, William Seested, being first duly sworn, hereby depose and state as follows:

1. I make this Affidavit in support of an application for a search warrant for the OnePlus cellular telephone ("**SUBJECT TELEPHONE**") bearing number 1-443-422-4466 and International Mobile Equipment Identity (IMEI) 865208040242672, currently stored in the custody of the Treasury Inspector General for Tax Administration (TIGTA) located at 5000 Ellin Road, Suite A1-400, Lanham, Maryland 20706.

2. The information to be searched is described in the following paragraphs and in Attachment A. This Affidavit is made in support of an application for a search warrant under 18 United States Code (U.S.C.) §§ 2703(a), (b)(1)(A) and (c)(1)(A) seeking authorization for an examination of the **SUBJECT TELEPHONE** for the purpose of identifying electronically stored data further described in Attachment B.

## INTRODUCTION AND AGENT BACKGROUND

3. I am a Special Agent with the Treasury Inspector General for Tax Administration ("TIGTA") and have been since September 2014. I am a graduate of the Criminal Investigator

Training Program at the Federal Law Enforcement Training Center as well as the TIGTA Special Agent Basic Training Academy. I am currently assigned to the Mid-Atlantic Field Division – New Carrollton, Maryland Office. I have received instruction and training, and have experience investigating threats and assaults towards the United States federal government and its employees. In the course of conducting or participating in criminal investigations, I have been involved in gathering and analyzing information, interviewing and debriefing witnesses and informants, conducting physical surveillance, and collecting and analyzing evidence.

4. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other law enforcement officers relating to this investigation. The information set forth in this Affidavit is based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel. I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested search and seizure warrant. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

5. Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 844(e) have been committed by **CODY WOLF GIDEON MOHR** ("**MOHR**") in the District of Maryland and elsewhere. There is also probable cause to search the information described in Attachment A for evidence and fruits of these crimes, as further described in Attachment B.

**JURISDICTION**

6. This Court has venue and jurisdiction to issue the requested warrant under Federal Rule of Criminal Procedure 41(b)(1) and (b)(3).

**PROBABLE CAUSE**

7. On or around January 19, 2021, the TIGTA Criminal Intelligence and Counterterrorism Division (CICD) conducted a routine review of publicly accessible social media accounts in order to identify and prevent potential threats to the Internal Revenue Service (IRS) and its employees. The review resulted in the identification of tweets on a Twitter page bearing the username "Game 6 Osama" and moniker "**@BonaFried**" in which the user threatened the IRS and federal employees, including political officials and law enforcement officers.

8. Among the tweets was a message dated on or around January 15, 2021 stating, "I am going to explode the irs headquarters with a bomb." Another Twitter user identified as "**@Captpraxis**" responded to this tweet on or around the same date stating, "Ok now you're just trying to get suspended to fit in." The user of **@BonaFried** responded to **@Captpraxis** on or around the same date stating, "I am simply announcing my intentions to give employees a fair shot at escaping alive." Additional tweets from **@BonaFried** on or around the same date included the following: "I'm about to drop something else. On the irs headquarters;" "Im gonna do it;" and "It's probably just a matter of if you happen to get reported or not (please don't report me)." On or around the following day, January 16, 2021, a tweet posted on **@BonaFried** stated: "something's gonna blow up."

9. The user of **@BonaFried** posted other tweets since on or around January 15, 2021, stating they were "laser focused on thinking about ways to kill [Speaker of the House] Nancy Pelosi." The user of **@BonaFried** further tweeted about ways to obtain firearms, how easy it was to build a semi-automatic rifle, and about sending a picture to another Twitter user in which the user placed a firearm in their mouth. The user of **@BonaFried** also stated it "[would be cool to] drive 80 mph into a million people," and that, "…if a cop pulls you over for something minor like speeding or

a busted tail light, you can just threaten his life and he'll let you go with no trouble." Several of the tweets from **@BonaFried** included a note stating, "Twitter for Android," indicating the user likely posted them from a cellular telephone utilizing an Android-based operating system. Also included on the top of the **@BonaFried** page was the following: "I'm Cody I'm from Maryland."

10. The tweets listed above are intended to provide a sampling of those posted by the user to **@BonaFried** rather than a comprehensive review, because Twitter suspended **@BonaFried** before your Affiant could conduct an in-depth analysis.

**INFORMATION RECEIVED FROM TWITTER**

11. TIGTA CICD requested an emergency disclosure of the subscriber information for **@BonaFried** from Twitter on or around January 19, 2021, which identified the user of the account as **MOHR**. An emergency petition was made because the IRS Headquarters is located in Zone 9 of the National Security Special Event Area for the upcoming 2021 Presidential Inauguration scheduled for the following day.

12. In addition to his name, the information returned from Twitter stated **MOHR** registered for **@BonaFried** on or around December 25, 2010. While registering for the account, **MOHR** listed his email address as cody.mohr@gmail.com, and his telephone number as that of the **SUBJECT TELEPHONE**. A registration Internet Protocol (IP) address was listed as 166.203.58.149.

13. Twitter additionally provided a listing of IP addresses used during recent logins to **@BonaFried** between the dates of on or around January 17, 2021 and January 19, 2021. On or around January 19, 2021, your Affiant utilized an IP address search engine that revealed the majority of **@BonaFried** logins occurred in or around the area of Columbia, Maryland, using an Internet Service Provider (ISP) identified as Verizon, Inc. Your Affiant further noted an account login on or

around January 18, 2021, which occurred in or around the area of Arlington, Virginia, which is located approximately four miles from the United States Capitol in Washington, DC, using a mobile ISP identified as T-Mobile, Inc. The information obtained by your Affiant suggests **MOHR** may have logged into **@BonaFried** using a cellular telephone utilizing an Android-based operating system, which was serviced by T-Mobile, Inc.

**ADDITIONAL INVESTIGATIVE INQUIRIES**

14. Based on the information received from Twitter, your Affiant conducted additional investigative queries on or around January 19, 2021, that revealed **MOHR** owns a 2014 Mazda3, bearing Maryland license plate 6CZ1566. On or around the same date, your Affiant attempted to locate **MOHR's** vehicle in or around the Columbia, Maryland area. The vehicle was located at approximately 9:30pm parked in front of 5490 Mystic Court, Columbia, Maryland 21044, which is believed to be the residence of an immediate family member.

15. Your Affiant obtained a driver's license photograph of **MOHR** from the National Law Enforcement Telecommunications System (NLETS) on or around January 19, 2021. That photograph appeared to closely match a photograph of a Caucasian male in his late twenties posted to **@BonaFried** on or around January 11, 2021.

**ARREST WARRANT**

16. On or around January 20, 2021, your Affiant located and arrested **MOHR** at 5490 Mystic Court, Columbia, Maryland 21044 pursuant to a warrant issued on or around the same date in the District of Maryland. **MOHR** was read his Miranda rights, noted he understood them and confirmed he was the owner of **@BonaFried**, before requesting to consult with an attorney prior to any further questioning.

17. Prior to leaving the scene, an individual approached and identified himself or herself as one of **MOHR's** immediate family members. Your Affiant asked if the family member knew whether **MOHR** had a Twitter account. The family member responded in the affirmative. The family member further advised the family member did not believe anyone other than **MOHR** had access to the account.

18. At the time of his arrest, **MOHR** had the **SUBJECT TELEPHONE** in his possession. OnePlus cellular telephones utilize an Android-based operating system, meaning tweets posted by **MOHR** to **@BonaFried** originating from the **SUBJECT TELEPHONE** could potentially include the note, "Twitter for Android" referenced previously. Your Affiant seized the **SUBJECT TELEPHONE**, placed it in airplane mode and catalogued it as evidence. Upon calling the number of the **SUBJECT TELEPHONE**, which was previously provided by Twitter, your Affiant immediately heard a voicemail message stating, "please leave your message for: **CODY MOHR**." On or around January 24, 2021, your Affiant confirmed the **SUBJECT TELEPHONE** was serviced by T-Mobile, Inc., which was listed as a mobile ISP of at least one login IP addresses to the **@BonaFried** on or around the date the threatening communications were posted.

19. On January 25, 2021, your Affiant received information from the Maryland State Police indicating **MOHR** had purchased two firearms in or around July 2018 and September 2018 from a Federal Firearms Licensee (FFL) located in Jessup, Maryland. A telephone number for **MOHR** on file for both purchases matched that of the **SUBJECT TELEPHONE**. On or around January 27, 2021, **MOHR** opted to voluntarily surrender his firearms to the government. An immediate family member provided the firearms to the Howard County Police Department (HCPD) on or around February 3, 2021, completing an HCPD Receipt for Surrendered Firearms/Ammunition

listing **MOHR** as the owner. A telephone number provided for **MOHR** also matched that of the **SUBJECT TELEPHONE**.

20. Based upon my training and experience, your Affiant has learned Twitter users often post tweets from their cellular telephones using a downloadable application ("app") known as the Twitter App. The Twitter App allows users to utilize the same functions of the website they would normally access from a personal home computer, but allows users to tweet, retweet, share, like and privately communicate with other users from anywhere via their cellular telephone. Once the Twitter App is downloaded to a user's cellular telephone and the user logs into Twitter, subsequent use of the Twitter App automatically opens to the user's account, and shows the user's activity and the activity of other Twitter users that the user has have followed. This feature is not only convenient for the user, but can also provide valuable evidence for law enforcement. For example, if a subject's cellular telephone contains the Twitter App, and it automatically opens to the subject's account from which the threatening communications were identified, such a finding would help to demonstrate the subject's culpability in willfully creating the same.

21. If permitted by the user, the Twitter App can also send "push notifications" alerting the user to mentions of the user's account, replies, retweets, likes, new followers, private direct messages, new contacts who have joined Twitter, personalized recommendations, highlights, news, emergency alerts and information concerning new Twitter features. The Twitter App also allows users to post photographs and videos stored on their cellular telephone directly to Twitter. Based upon my training and experience, your Affiant has learned that such photographs and videos often remain on the user's cellular telephone long after being shared publically, and can provide valuable evidence as to how, why and from where such media originated, as well as who posted them.

22. In addition to the Twitter App, your Affiant is aware of numerous other third-party apps that can be downloaded to a user's cellular telephone and be used to enhance their experiences on Twitter, and in some cases, utilize Twitter's services without directly connecting to their website. These apps include, but are not limited to, "Periscope," "Tweetbot 6," "Twitterific," "TweetCaster," "Echofon," "UberSocial," "Hootsuite" and "Crowdfire." While using such apps, users can access broader functionality than what is offered by Twitter alone, such as management and simultaneous posting of content to multiple social media platforms, creating private lists and notes, broadcasting live videos, creating and editing drafted tweets, setting content calendars to plan future tweets, sending and receiving private messages independent of Twitter, and using geolocation. As third-party applications, the contents of these sources would not be known or even accessible to law enforcement from a search warrant of a subject's Twitter account alone.

23. Among their many different functions, cellular telephones can also be used to access the internet and search any number of topics, and those searches are catalogued and stored in the internet history. As such, your Affiant submits it is reasonable to believe a subject may search for information regarding a criminal act prior to committing the same, and that those searches could be used by law enforcement to identify a subject's motive and intent to commit a crime, as well as whether the subject was aware such an act was legally prohibited.

24. Based upon my training and experience, your Affiant submits that there is probable cause to believe that the **SUBJECT TELEPHONE** was used in furtherance of violations of 18 U.S.C. § 844(e), is controlled by **MOHR**, and will contain additional evidence of the same.

## TECHNICAL TERMINOLOGY

25. Based on my training and experience, I use the following technical terminology to convey the following meanings:

a. Cellular telephone: A cellular telephone (also known as a mobile telephone or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. Cellular telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones, traditional "landline" telephones and other electronic devices. A cellular telephone usually contains a "call log," which records the telephone number, date and time of incoming and outgoing calls. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mails; taking, sending, receiving and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining past and present locations of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (also known as an MP3 Player) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude and sometimes altitude with a high level of precision.

e. Personal digital assistant: A personal digital assistant is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some personal digital assistants also function as wireless communication devices used to access the Internet, and send and receive e-mail. Personal digital assistants usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most personal digital assistants run computer software, giving them many of the same capabilities as personal computers. For example, personal digital assistants users can work with word-processing documents, spreadsheets, and presentations. Personal digital assistants may also include global positioning system ("GPS") technology for determining the location of the device.

f. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of

IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training and experience, I know that the **SUBJECT TELEPHONE** has capabilities allowing it to serve as a telephone, digital camera, portable media player, GPS navigation device and personal digital assistant. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

27. Based on my training and experience, I know that cellular telephones can be used to transmit threatening communications, connect with potential co-conspirators across substantial distances (including through use of the Internet) and conduct activities in furtherance of such threats. Data obtained from cellular telephones of those involved in threat investigations (such as contacts, call logs, location data, and photos) may also indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). Cellular telephones also commonly contain indicia of ownership and information identifying users of the devices. The foregoing information is commonly maintained within the cellular telephone for substantial periods of time, to include several months and even years, and constitutes evidence, fruits, and instrumentalities of the aforementioned crimes. Similarly, things that have been

viewed on cellular telephones via the Internet are typically stored for some period of time. This information can sometimes be recovered from cellular telephones with forensics tools.

28. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the offense described in the warrant, but also forensic evidence that establishes how the **SUBJECT TELEPHONE** was used, the purpose of its use, who used it and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT TELEPHONE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

29. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT TELEPHONE** consistent with the warrant. The examination may require law enforcement authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **SUBJECT TELEPHONE** to human inspection in order to determine whether it is evidence described by the warrant.

**CONCLUSION**

30. Based on my training and experience, and the facts set forth in this affidavit, I submit that there is probable cause to believe the **SUBJECT TELEPHONE** contains evidence, fruits and instrumentalities relating to the above violations of 18 U.S.C. § 844(e).

31. Based on the forgoing, I request that the Court issue the proposed search warrant. Because this warrant seeks permission to examine a device already in law enforcement's possession,

there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

William Seested

William Seested, Special Agent
Treasury Inspector General for Tax
Administration (TIGTA)

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 17, 2021.

_________________________________
The Honorable Thomas M. DiGirolamo
United States Magistrate Judge

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with the OnePlus cellular telephone ("**SUBJECT TELEPHONE**") bearing number 1-443-422-4466 and International Mobile Equipment Identity (IMEI) 865208040242672, currently stored in the custody of the Treasury Inspector General for Tax Administration (TIGTA) located at 5000 Ellin Road, Suite A1-400, Lanham, Maryland 20706.

**ATTACHMENT B**
**Particular Things to be Seized**

1. All records and information on the **SUBJECT TELEPHONE** described in Attachment A that relate to violations of 18 U.S.C § 844(e), including:

a. All records relating to email accounts, messages and user information containing information regarding threats against the government and its employees, political figures and law enforcement officers.;

b. identifying information of co-conspirators;

c. any and all lists of names, telephone numbers, and addresses related the same threats;

d. information related to firearms, ammunition, explosives and/or pre-cursor chemicals used to make homemade explosives;

e. any information recording **MOHR's** schedule or travel; and

f. all bank records, checks, credit card bills, account information and other financial records, receipts for payment and disbursement of services, cellular phone contracts and bills, and any banking and financial records, including money orders or bank statements which may reflect purchases of firearms, ammunition, explosives and/or pre-cursor chemicals used to make homemade explosives.

2. Evidence of user attribution showing who used or owned the **SUBJECT TELEPHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

5. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.